**WALL v. ÆTNA CASUALTY & SURETY CO. et al.**

**No. 1594.**

Court of Appeal of Louisiana. First Circuit.

May 8, 1936.

St. Clair Adams & Son, of New Orleans, and C. Sidney Frederick, of Covington, for Ætna. Casualty & Surety Co. and others.

Harvey E. Ellis and Frank B. Ellis, of Covington, for Mrs. Vallie Wall.

BORRON, Judge ad hoc.

This a suit to recover damages for personal injuries, loss of time, and medical expenses alleged to have been suffered by the plaintiff as the result of an automobile accident.

It is alleged plaintiff was struck down by an automobile owned by defendants Fred W. Salmen and Ella Rose Sullivan and W. H. Sullivan, Jr., minors, at the time driven by one of the defendants, a negro chauffeur, in the employ of the owners of the automobile, and at the time acting within the scope of his employment. The Ætna Casualty & Surety Company was also made a party defendant as insurer against public liability.

It is alleged and contended, in substance by plaintiff, that on the 24th day of June in the year 1934, about 9 o'clock p. m. she, accompanied by a friend, a resident of the city of New Orleans, left her place of business, the Golden Goose Tea Room, in the town of Slidell, parish of St. Tammany, and walked across to the west side of U. S. Highway No. 90 which runs, in a northern and southern direction, immediately in front of her place of business, known as the Golden Goose Tea Room, in order that her friend might flag and get aboard a passenger bus to return to the city of New Orleans.

That following the departure of her friend on the passenger bus, she remained at her position on the west side or shoulder of this highway, opposite her place of business, for the southbound lane of the highway to clear; that she then took several steps into the southbound traffic lane, and when reaching a point about midway thereof, she again stopped in order to allow the northbound traffic lane to clear before proceeding further across to her place of business. That at this time the nearest automobile in the northbound traffic lane in front of her was passing in front of a drug store located about 100 feet south of plaintiff's position. That when this approaching automobile reached a point about midway of an automobile parking lot which extends about 100 feet along the eastern side of this highway, and lying between plaintiff's tea room and the drug store, the driver of the automobile slowed down, held out his hand, and turned the automobile to his right and into the parking lot. That as this car reduced speed and turned into the parking lot, a large Lincoln automobile shot suddenly out from the rear of the turning car, and to the left from the northbound traffic lane of the highway and crossed to the wrong side thereof or into the southbound traffic lane, where plaintiff, at the time, was standing. That the movement of this Lincoln automobile was so sudden and unexpected by

her she was unable to extricate herself or to get out of its way, and that she was struck by the front side of the left fender of the automobile, thrown into the air, and falling back against the side of the car she was carried forward and to the right a few feet by the momentum of the car and pitched into the highway in the southbound traffic lane at a point about 2 feet west of the black line dividing the traffic lanes of the said highway, where she was found and picked up immediately after the accident.

That immediately after the accident she was removed to her place of business and given first aid treatment by a physician, and, because of her serious condition, was by the physician ordered taken by ambulance to the city of New Orleans, where she was placed under the care of a specialist (Dr. Martin C. Miller), who found plaintiff was suffering from two fractures of the right leg and a displacement of the distal fragment near the foot; a fracture of the right elbow and of the nose, with displacement of the nose and a cut above the right elbow; injuries to her fingers, brush burns, and bruises over her entire body, and shock to her nervous system.

We gather from the rather elaborate petition, as stated in brief of learned counsel for defendants and found by the trial court, the acts of negligence charged against the driver of the Lincoln automobile are as follows: Driving at an excessive and unlawful rate of speed in a careless and negligent manner: trailing closely behind another car at an unlawful rate of speed; suddenly swerving to the left and to the wrong side of the highway; failure to have the automobile under such control as to be able to stop in an emergency; and failing to see petitioner where she stood on the highway, and in failing to bring the automobile to a stop, thereby avoiding the accident.

The defendants admit the ownership of the car and its operation at the time of the accident by their employee, acting within the scope of his employment, but deny any negligence on the part of the chauffeur, and, in the alternative, allege contributory negligence on the part of the plaintiff as a bar to her recovery.

In substance, it is alleged that on the night of the accident at about the hour of 8:55 p. m. the chauffeur was instructed to convey to her home, some 7 miles east of Slidell, a servant of one of the defendants; that to carry out this instruction it was necessary for the chauffeur to drive through the town of Slidell on U. S. Highway No. 90; that at the time he was driving at a speed of approximately 18 miles an hour, with no automobiles in front of him and none immediately to his rear, in that portion of the road used by the northbound traffic; that there was very little, if any, traffic northbound at the time, but an almost constant stream of southbound traffic; that when the chauffeur was about to pass the Golden Goose Tea Room, which is located on the east side of the highway in the town of Slidell, the plaintiff suddenly stepped out into the middle of the highway from behind an automobile traveling south on the west side of the highway; that at the time the automobile was approximately 20 feet away from the plaintiff, and that the chauffeur immediately swerved to the right, and at the time applied his brakes; that the plaintiff either did not see the automobile or became confused, because she continued to cross the highway and ran into the left side of the automobile at about the rear part of the front door; that the front of the automobile did not strike plaintiff, but she was struck by the left front door handle which threw her against the left front fender and wheel; that the automobile came to a complete stop within a space of 10 feet from where the plaintiff ran into the door; that the driver immediately got out of the automobile and picked plaintiff up and carried her into the Golden Goose Tea Room; that the defendants were in no wise negligent or at fault; that the automobile was in perfect mechanical condition, with its headlights burning brightly, and was being operated with all due care and caution, and in accordance with all traffic laws of the state of Louisiana and the town of Slidell.

As specific acts of contributory negligence, it is further alleged that the plaintiff was negligent, "(a) in attempting to cross U. S. Highway No. 90 at a time it was imprudent and reckless to do so; (b) in suddenly emerging from behind an automobile, travelling south, into that portion of the highway used by northbound traffic, without ascertaining that the complete crossing could be made in safety; (c) in failing to see defendants' automobile although the headlights were burning brightly; (d) in negligently and recklessly crossing U. S. highway No. 90 directly in the path of defendants' automobile and in

running into the side of the automobile after defendants' driver applied his brakes and swerved as far as possible to the right; (e) in attempting to cross U. S. highway No. 90 at a time when she knew, or should have known, that automobiles were approaching the point at which she was crossing at a time when it was not safe for her to enter onto the Highway or attempt to complete the crossing."

There was judgment by the trial court in favor of the plaintiff and against the defendants, individually and in solido, in the sum of $6,891.20, with legal interest from judicial demand, and costs.

From this judgment, both plaintiff and defendants have appealed.

The case was submitted to this court, without oral argument, on exhaustive briefs, which have very clearly analyzed the facts and the issues as presented by a rather voluminous record.

The evidence shows that U. S. Highway No. 90 forms part of one of the principal streets of the town of Slidell; that it runs north and south and parallel to, and adjoins on the east, the right of way of the Southern Railroad, and forms a street in the business section of the town; that at the place of the accident this highway and street has a concrete pavement 18 feet wide, with the usual black line down the center to indicate the northbound and southbound lanes of traffic; that adjoining and along the eastern side of this main highway, and extending to the sidewalk, is a strip of pavement 8 feet wide, making the total width of the paved highway or street at the point of the accident 26 feet, 9 feet of which is to the west of the black line along the center of the main highway, constituting the southbound traffic lane, and 17 feet to the east of the black line, constituting at the place of the accident the northbound traffic lane; that there is a shoulder at the west side of the highway, adjoining the right of way of the railroad; that pedestrians make frequent use of paths, leading from points west of the railroad, across the railroad and up to and across the highway or street; that one of these path and street intersections is in front of plaintiff's place of business or tea room where the accident happened.

That there is a parking lot for automobiles adjoining plaintiff's place of business, and fronting on the street or highway to the south; that at the southern limits of this parking ground or lot is located a drug store building, known as Langston's Drug Store, and at the northern limits is located the tea room owned and operated by plaintiff. That the width along the highway of this parking lot is about 100 feet.

That passenger busses regularly travel this highway through the town of Slidell and make stops, on the proper side of the highway, at any point flagged, to take on passengers, and that at about the time, contended by plaintiff, she was struck and seriously injured by a Lincoln automobile, driven by the defendant chauffeur while she was crossing this street or highway, in front of her place of business, from the west side thereof where, a few minutes prior, she had gone to see a friend off on one of these busses en route to the city of New Orleans.

As stated by the trial judge in his written reasons for judgment, "The pleadings have narrowed the issues to the question of whether or not the driver of the car was guilty of negligence and if so, whether or not plaintiff was guilty of such contributory negligence as to preclude her recovery; and in case of liability, the amount and damages."

As to the charges of negligence urged by the plaintiff against the driver of the automobile, that he was driving the car at an excessive and unlawful rate of speed and that he was trailing too closely behind another car going in the same direction, the trial judge found the evidence did not support either of these charges. A careful review of the testimony convinces us that he was correct, and we now so hold.

In disposing of the other grounds of negligence charged against the driver of the automobile, and the acts of contributory negligence urged against the plaintiff by the defendants, the trial judge found and concisely states, as follows:

"The other grounds of negligence alleged against the driver of the Lincoln car are summarized as follows: (c) Suddenly swerving to the left and to the wrong side of the road; (d) failure to have the automobile under such control as to be able to stop in an emergency; and (e) failing to see plaintiff where she stood on the highway, and failing to bring the automobile to a stop before striking the plaintiff. All of these grounds of negligence are closely related and will be discussed together.

"The driver of the car which struck the plaintiff claims that she was struck on the

right side of the highway, about 2 feet east of the dividing line. The plaintiff claims that she was struck on the west side of the highway, about midway between the center line and the west side of the pavement. The exact point on the highway where plaintiff was struck becomes a vital and material factor in this case. If she was struck in the southbound lane of traffic, as she claims, it is evident that the driver of the Lincoln car left his side of the road and struck plaintiff on the wrong side of the road.

"The testimony is conclusive to the effect that, after the accident, the plaintiff was found on the west side of the center line. Her position is placed after the accident at about 2 feet west of the center line, with her feet extending out toward, and almost to the center line. The place where she was found sitting or lying after the collision with the car is important, but not conclusive, as to the point where she was struck. Manifestly, she could have been struck on the east side of the center line and thrown by the force of the impact into the southbound lane of traffic. In fact, the experience of life and the laws of physics rather tend to support that conclusion, leaving out of consideration the evidence in the case to the contrary. This feature of the case can only be explained and weakened by the theory, supported by some evidence, that the Lincoln car at the moment of the impact was turning to the right to re-enter the northbound traffic lane, and had a tendency to carry plaintiff along in that direction after being struck by the left fender of the car, throwing her to the ground a few feet from the place of impact, and about the same distance, or slightly nearer the center line, from where the impact took place.

"Plaintiff testifies that the impact took place west of the center line. (Tes. p. 181, Photographs marked Wall, Nos. 22, 23, 24, and 27.) She is corroborated in this testimony by the witness Millis, who claims to have seen the accident from a distance of about 40 feet, and states that plaintiff was struck 4 or 5 feet west of center line, after the Lincoln car had swerved to the left from the right side of the road. Millis' testimony is vehemently attacked by the defendants. It is even argued that he was not near the scene of the accident. While there is some conflict in the testimony of this witness and that of the other evidence in the case, yet the court is not justified in discarding his testimony altogether and giving it no probative value at all. Much of his testimony does fit the testimony of other witnesses in the case.

"W. E. Gains, another witness presented by plaintiff, did not see the actual impact, but claims to have seen the car driven by the negro chauffeur after it had struck the lady; that he heard the brakes screeching and sparks coming from behind the car as it ran against the banquette on the east side of the road. He saw Mrs. Wall on the west side of the road, sitting on the pavement with her arm outstretched. The testimony of this witness is impeached to the extent of weakening its effect very materially. However, what he says about seeing Mrs. Wall on the west side of the road just after the collision is corroborated by other witnesses whose testimony impresses me as being true. See testimony of Anthony Chadwick, p. 102, Mrs. Chadwick, p. 108, L. E. Sollberger, p. 148, and Mrs. Sollberger, p. 152.

"While the witness Frank Galatas did not testify in court that the Lincoln car had swerved to the left before striking Mrs. Wall, yet it appears that, in a voluntary statement made by him July 1, 1934, shortly after the accident, he stated that the Lincoln car was being driven near the center of the road, swerved to the left, and then suddenly swerved again to the right, and came to a stop 15 or 20 feet from where it swerved to right. (Ts. p. 86.) He admitted that when he gave this statement to counsel shortly after the occurrence, his mind was fresher on the details than when he testified, and that the statement given by him in that respect might have been true.

" "This witness appeared rather hostile to plaintiff, and testified with evident reluctance. The testimony of the chauffeur to the effect that plaintiff was struck east of the center of the road, some 2 feet from the dividing line, while he, the driver of the car, was driving on his right side, stands alone and uncorroborated. A very decided preponderance of the evidence supports the conclusion that the driver of the car which struck plaintiff pulled his car over into the southbound traffic lane where plaintiff was struck, and that he did not see her in time to stop. The result of this finding of fact is to place the negligence on the driver of the car in thus swerving to the wrong side of the road and failing to see the plaintiff and stop his car as the proximate cause of the injury.

"Ordinarily, in driving a car on the wrong side of the road even for the purpose of passing another car, the driver is held to the utmost care, and should be able to see a sufficient distance ahead to prevent running into an object or a person on that side of the road. This rule of law is clearly stated in Act No. 21 of 1932, § 3, rule 7 (c), as follows:

" 'The driver of a vehicle shall not drive to the left side of the center line of the highway in overtaking and passing another vehicle traveling in the same direction, unless such left side is clearly visible and free from oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be made in perfect safety; provided, that whenever an accident occurs under such circumstances, the responsibility therefor shall rest prima facie upon the driver of the vehicle doing the overtaking or passing.'

"See, also, Greer v. Hamilton, 3 La.App. 120; Simpson v. Hyde (La.App.) 147 So. 759.

"The driver of the car causing the injury being guilty of negligence in swerving to the left side of the road, and in failing to see plaintiff and stop his car in time to prevent striking plaintiff, it becomes necessary to determine whether or not plaintiff was guilty of contributory negligence as alleged by defendants in the answer.

"Briefly, the grounds of negligence charged to plaintiff are: In attempting to cross this highway at a time and place where it was dangerous to do so; in suddenly emerging from behind an automobile traveling south into the east or northbound lane of traffic at a time when it was dangerous to do so; in failing to see defendants' automobile, although the lights were burning brightly; in recklessly crossing the highway directly in front of defendants' car, and running into the side of it, etc.

"There was no negligence in plaintiff in attempting to cross the highway at the place of the accident, nor at the time she did make the attempt. The highway was used frequently at this point by pedestrians crossing from the other side of town through the path over the railroad. Even though the driver of the Lincoln car may have had the right of way because of the fact that the crossing was not attempted at a regular intersection, yet, as has already been concluded, the plaintiff yielded that right of way by not entering the east lane of traffic before the northbound traffic cleared. The driver of the car had no right of way on the west side of the road going north. Rule 11, (c) and (d), Act No. 21 of 1932, § 3.

"The proof does not support the allegation of contributory negligence that plaintiff suddenly darted from behind a car into the east lane of traffic directly in front of the Lincoln car. Nor does it support the allegation that plaintiff ran directly into the path of the car driven by the chauffeur. The evidence supports the conclusion that at the time plaintiff attempted to cross the highway, there were no cars coming from the north along the west lane of traffic within a dangerously close distance from where the crossing was attempted, but, on the contrary, shows that the west lane of traffic was sufficiently clear of traffic to justify plaintiff in entering that lane of traffic where she was struck by the driver of the car who swerved from his side of the road, where he should have seen plaintiff in time to stop his car.

"Having reached the conclusion that the driver of the Lincoln car was guilty of negligence in suddenly swerving his car to the left into the west lane of traffic, and in failing to see plaintiff and stop his car before striking her, it is unnecessary to consider the doctrine of 'last clear chance' raised in the case.

"It only remains to fix the quantum of damages suffered by plaintiff."

From a review of the record, we are of the opinion that the foregoing finding and analysis of the facts and conclusions thereon by the trial judge are correct, and, as we do not feel we can express here the factual analysis and conclusions based thereon with any greater clarity of diction or soundness of reasoning than has been used by him in reaching his conclusion on the issues of negligence and responsibility for the accident, we unhesitatingly adopt, as a part of this opinion, his language as above set forth.

■ Learned counsel for defendants contend that more importance should be attributed to the physical facts than was given by the trial court in determining plaintiff's location in the highway at the time of the accident; that the judge recognized the importance of the physical facts, but permitted the testimony of plaintiff, an interested witness, and of two other witnesses, to outweigh the inevitable conclusions to be reached from the position of plaintiff

after the accident, "that fallible testimony has been allowed to supplant known facts and the laws of physics." We are of the opinion that the trial judge was correct in his conclusions on this question of fact, not only on the grounds stated by him in support thereof, but for the further and additional reason that while resultant physical facts, under the law of physics, may ordinarily be safe guides in ascertaining a correct knowledge as to causal facts, yet the accuracy or correctness of the conclusions thus reached must necessarily depend upon the accuracy of the knowledge as to the factual situation or force that put into operation the invoked law of physics which produced or caused the resultant facts or situation. We find no sufficient evidence in the record that gives an accurate knowledge of such facts here, of the exact position of the plaintiff's body or of the automobile at the moment she was struck. Any slight variation in the position of the automobile or of plaintiff, at the time of the impact, would cause a resultant variation in her position as a result of the impact, or the direction of her fall. Furthermore, other intervening causes could well account for the exact position of the plaintiff in the highway immediately after the accident.

In view of this uncertainty as to the primary facts, we are of the opinion that the trial judge correctly disregarded any theory based solely on the law of physics to reach a conclusion as to plaintiff's position in the highway at the time she was struck by the automobile, and, instead, predicated his conclusion on grounds more certain; the plaintiff's testimony, supported by the testimony of two others witnesses, with no contradiction other than the testimony of the driver of the automobile.

On the other hand, the law of physical possibilities tends to destroy, if indeed it does not completely destroy, the defendants' contention, predicated solely on the testimony of the operator of the automobile, that the plaintiff suddenly stepped out into the middle of the highway from behind an automobile which was traveling south on the west side of the highway, and that at the time the Lincoln automobile was approximately 20 feet from the plaintiff and had just cleared or passed the automobile traveling south on the west side of the highway and from behind which the plaintiff had suddenly emerged.

It is obvious that if the plaintiff stepped from behind the automobile traveling south in the south lane of traffic, it would have been necessary for her to have first remained out of the path of this automobile, which would have placed her near the western edge of the highway. The chauffeur testified he was operating his car at the time about 2 feet to the east of the black line dividing the main highway of 18 feet in width. This placed his car about 11 feet from the west edge of the highway at which point, as we have seen, plaintiff necessarily would have had to have been to allow the southbound automobile to pass. Therefore, if defendants' contentions were correct, plaintiff traveled or projected herself some 11 feet or more across the southbound lane of traffic in front of the Lincoln automobile, almost instantly or during the time required for the southbound automobile to travel only 20 feet. We do not believe this to have been physically possible. Even had it been possible for the plaintiff to have covered this distance of 11 or more feet while the automobile was traveling 20 feet, by a sudden leap or run, the chauffeur does not testify that she either ran or jumped from behind the automobile into the northbound traffic lane in front of him, but that she "stepped out into the street" and was "standing still" when he first saw her.

We are of the opinion that the evidence fully supports the conclusion of the trial judge that the negligence of the driver of the automobile was the sole cause of the accident, and we so hold.

This brings us to a review of the question of the amount of the damages allowed to the plaintiff by the trial court for personal injuries, suffering, loss of earning capacity, and expense.

Plaintiff claims an aggregate amount of $27,381.20; of this total $1,556.20 is claimed for expenses; $825 for loss of earning capacity; and $25,000 for injuries and suffering.

The trial judge found that plaintiff made proper proof of expenses to the amount of $1,481.20 only, and her claim of $825 for loss of earning capacity for seven months he reduced to the amount of $500. We are of the opinion his conclusion as to these two items of damage are correct, and will not be disturbed.

As damages for personal injuries and suffering, the trial judge allowed the

plaintiff $5,000 "for all the injuries and pain attendant thereon." A careful review of the evidence convinces us that this amount should be increased to $6,500.

In reaching his conclusion as to these items of damage, the trial judge states: "The other items of damage arise from alleged personal injuries to plaintiff are made up of the following: Two complete fractures of the right leg, one just below the knee and the other between the knee and ankle, and a dislocation of the distal fragment near the foot, with a shortening of the right leg; a comminuted fracture of the right elbow, with a cut above the elbow, leaving a scar and pain in the shoulder; a fracture of the nose at juncture of nasal bones, causing difficulty in breathing, injury to ring fingers of both hands, brush bruises and burns over entire body and general shock.

"A mass of testimony was offered in an effort to show the nature and extent of these injuries. The greater part of this was by physicians and surgeons, whose testimony is not only conflicting and confusing in many respects, but is actually bewildering to the mind of the layman. After reading and attempting to reconcile and apply this volume of testimony, the court finds itself, after all, under the necessity of applying its own judgment as to the extent and nature of the injuries suffered by the plaintiff. Dr. Griffith was frank enough not to make an attempt to qualify as an expert and give his opinion in the case. The plaintiff, whether consciously or not, impressed the court as making a rather studied effort to exaggerate her injuries.

"There is no doubt but that plaintiff sustained serious and very painful injuries. For the first few months her pain, from all the testimony in the case, must have been severe. The preponderance of testimony indicates that the fractures of the right leg have healed, and with proper use the leg will be restored to practically normal function, with a permanent shortening, however, of about one-half inch. There is considerable atrophy in this leg which will probably disappear after use for a few months. All the doctors agree that the lady should make an effort to use the leg without crutches or the brace in order to gradually restore normal functioning of the member.

"The fracture of the right arm seems to have healed with good union. There seems to be a pain in the shoulder, but the prevailing opinion of the experts is to the effect that this will disappear after a time. There is some stiffness in the fingers which will probably be overcome after the fingers are flexed and used for a sufficient length of time. The fracture of the nasal bone has healed in place, but there seems to be some displacement in the right nose, causing difficulty in breathing, which condition gives rise to considerable discomfort on the part of the plaintiff, and may be a permanent condition. The brush bruises have healed, and it is reasonable to assume that the nervous condition will gradually disappear after the patient becomes able to use the injured members, and the pain diminishes and disappears."

■ We agree with the trial judge that the conflicting experts' testimony tends to leave the mind in some confusion and uncertainty as to the extent and permanency of plaintiff's injuries, but we do not feel justified in disregarding entirely such testimony, given, as it was, by recognized specialists of conceded high standing; preferably reconcilement, as far as possible, of such conflicting opinions should be made, and where this is impossible, resort should be had to a consideration of the opportunity afforded to the respective experts to obtain the facts and make the observations upon which their respective conflicting opinions and conclusions are based, in order to determine the probable accuracy of the data used by them in reaching their opinions. North Dakota v. Minnesota, 263 U.S. 365, 44 S.Ct. 138, 68 L.Ed. 342.

We have had little difficulty in reaching the conclusion that Dr. Martin O. Miller, of the city of New Orleans, the plaintiff's attending physician and surgeon, an expert of conceded authority and standing, who treated the plaintiff and had her under daily observation for practically a month at the hospital in the city of New Orleans, and who, from time to time, examined and treated her for several months after her return to her home, had far better opportunity to determine the nature, extent, and the degree of her injuries and suffering, and to say whether or not the injuries, or any of them, are of a permanent nature than the physicians and surgeons, though of equal high standing, who testified for the defendant, and whose views differ, in many respects, with those expressed by Dr. Miller, especially as to

the permanency of plaintiff's injury, since the views and opinions of the experts who testified for the defendant were based on special and isolated examinations, made at the request of the defendant insurance company, and were not the result of information obtained by continuous treatment and observation, extending over a period of several months, as we find was Dr. Miller's opportunity and experience with the case.

Dr. Miller testifies that on his first examination of the plaintiff, when she arrived at the hospital in New Orleans on the night of her injuries, he found her condition to be as follows:

"On examination it revealed that Mrs. Wall had been in an accident, suffering with excruciating pains, she was in a state of shock, semiconsciousness, suffering with contusion of the right shoulder with a possible fracture, severe contusion of the right elbow with a possible fracture, a lacerated wound about the right elbow and the under surface of the arm about two inches in length, a fractured right leg, middle one-half, with deformity."

He further testified that he considered her condition "critical and serious"; that she was in a state of shock and general contusion and multiple brush burns and fractures; that she would have been an easy subject for further complications, which may cause death. He also testified that the plaintiff will probably always require some aid of some kind, either in a walking stick, or if the legs should give her too much trouble in the region of the break, it may be that she would have to have a modeled splint for some degree of support; that this leg injury is unquestionably permanent. In this he is supported by Dr. Paul G. LeCroix, a specialist also of conceded competency and standing.

The plaintiff's other injuries, except the nose injury, as to which Dr. E. Garland Walls, a specialist called by the plaintiff, testified, is also probably permanent as a result of fracture and displacement of the lower portion, while more or less serious and apparently painful, yet do not appear to be of a permanent nature. When all of plaintiff's injuries, her nervous and physical shock, which the testimony shows to have been serious, are considered together with her age of middle life, we are compelled to the view that her general good health, which the evidence shows she enjoyed prior to the accident, has unquestionably been seriously impaired and her physical capacity to carry on the business by which she earns her living considerably lessened.

Therefore, it is ordered that the judgment of the trial court be amended by increasing the total amount thereof to $8,481.20, and, as amended, affirmed. The cost of the appeal to be paid by defendants and appellants.

OTT, J., recused.